IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARK HUGHES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | No. 3:18-cv-1770-B-BN |
| | § | |
| CITY OF DALLAS, TEXAS, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE**

Plaintiff Mark Hughes, through counsel, filed an amended complaint asserting

that Defendant City of Dallas unlawfully arrested and unlawfully detained him in

violation of his Fourth and Fourteenth Amendment rights. *See* Dkt. No. 29.

The City then moved to dismiss the complaint under Federal Rule of Civil

Procedure 12(b)(6). *See* Dkt. No. 30. And United States District Judge Jane J. Boyle

referred this case to the undersigned United States magistrate judge for pretrial

management under 28 U.S.C. § 636(b). *See* Dkt. No. 31.

Hughes responded. *See* Dkt. No. 33. The City replied. *See* Dkt. No. 34. And the

undersigned enters these findings of fact, conclusions of law, and recommendation

that the Court should deny the City's motion to dismiss.

**Applicable Background**

The undersigned first notes that, while the amended complaint twice

references the Fourteenth Amendment, *see* Dkt. No. 29, ¶¶ 1 & 9, Hughes alleges no

facts to support a constitutional violation other than one under the Fourth

Amendment:

On Thursday, July 7, 2016, [he and his brother, Cory Hughes,] attended an antipolice brutality rally in Dallas, Texas after the shooting death of licensed gun-holder Philando Castile and unarmed Alton Sterling.

In protest of the shooting death of Philando Castile, Mark Hughes brought his long-gun with him to the protest as a symbol that African American men had the right to exercise their Second Amendment privileges without fear of being gunned down.

The Hughes Brothers participated in the peaceful rally without incident along with roughly 800 other people that marched from Belo Garden Park up to Commerce Street towards El Centro. The rally was also attended by several other counter-protesters who were also openly displaying firearms during the protest.

Upon arrival, Mark Hughes presented his weapon to a nearby law enforcement officer who met Mark and briefly inspected the weapon. Soon after, Mark joined the protesters and was seen with the weapon during … Cory Hughes'[] speech at the rally and continually during the course of the march with the weapon held over his shoulder attached to a gun strap.

At about 8:45 p.m. the protesters had begun to disperse. However, approximately ten minutes later, shots rang out. Hearing the shots Cory Hughes immediately found his brother Mark and told him to turn his rifle over to police officers on the scene so that Mark would not be mistaken as the shooter.

Mark Hughes turned his rifle in to a Dallas Police Officer and received a receipt and a business card with contact information to retrieve his rifle the following day. This interaction was recorded on official Dallas Police forms and was captured by a cellphone recording. The Hughes brothers then began to assist the Dallas Police Department by helping people evacuate the area safely.

The Dallas Police Department maintains a Twitter account using the handle @DallasPD. The account is verified by Twitter. The account states that it is the "Official Twitter Account for the Dallas Police Department."

Around 10:52pm, the Dallas Police Department released an official statement by publishing a tweet on its Official Account identifying Mark Hughes as the suspect in the mass shooting along with a picture of Mr. Hughes holding his AR-15 rifle.

Additionally, Dallas Police Chief David Brown held a press conference again showing a picture of Mr. Hughes and identifying him as the suspect in the mass shooting. Chief Brown instructed the public to call 911 if they saw Hughes and stating the Dallas P.D. would "bring

him to justice."

Upon information and belief, Mr. Hughes' picture was also circulated to Dallas P.D. officers as the suspect in the mass shooting.

At the time of the official statement via Twitter and the press conference announcement by Chief Brown, the only evidence known to Chief Brown and the Dallas P.D. linking Mark Hughes to the mass shooting consisted of the following:

Mark Hughes was observed attending the protest on July 7, 2016; and,

Mark Hughes was observed carrying a firearm.

This evidence did not create reasonable suspicion to detain Mr. Hughes or probable cause to arrest him. This is particularly obvious in light of the following facts known to Chief Brown and the Dallas P.D.:

Approximately 800 people attended the July 7th protest;

Multiple people at the protest were openly carrying firearms;

It is not a crime to attend a protest; and

It is not a crime to openly carry a firearm in Texas.

This limited and legally insufficient evidence was known to Chief Brown. Nonetheless, he issued public and internal statements identifying Mr. Hughes as the suspect.

Mark Hughes was headed towards his car when he received a phone call that he had been identified as the suspect involved in the shooting by DPD.

Mr. Hughes immediately went to a small group of police officers and turned himself in in an effort to clear up this obvious mistake.

In light of the official announcement that Mr. Hughes was a suspect by the Dallas P.D. Twitter account, the official announcement by Chief Brown that Mr. Hughes was wanted, and internal police department communications identifying Mr. Hughes as the suspect who should be detained for the mass shooting, the officer determined that he should place Mr. Hughes under arrest. Mr. Hughes was handcuffed, his shirt and keys were confiscated and he was transported to police headquarters.

After hearing of his brother's arrest, Cory Hughes traveled to the police headquarters as well. Upon his arrival he was also detained for questioning.

Both Cory and Mark Hughes were interrogated without proper Miranda warnings.

An attorney, hired by the family of the Hughes brothers, presented himself to the police department and asked to speak with the two brothers. The attorney was denied access.

Forensic testing was conducted on each of the Hughes brothers.

After each man denied any involvement in the shooting and passed forensic testing, they were placed in a police vehicle and driven

back to the downtown area where they were released.

However, DPD retained possession of Mark Hughes' gun, keys, and shirt.

Posts identifying Mark Hughes as the suspect in the mass shooting of five police officers remained posted on DPD social media accounts for the next two months.

For the next five months Dallas P.D. repeatedly refused to return Mr. Hughes' firearm and other items.

Dkt. No. 29, ¶¶ 12-34.

The Court dismissed the original complaint (filed by Mark and Cory Hughes) with prejudice to the claims against the Dallas Police Department and the state-law tort claims against the City and without prejudice as to the constitutional claims against the City. *See Hughes v. City of Dallas, Tex.*, No. 3:18-cv-1770-B, 2019 WL 3081654 (N.D. Tex. July 15, 2019).

## Legal Standards

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205-06 (5th Cir. 2007). But a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and must plead those facts with enough specificity "to raise a right to relief above the speculative level," *id.* at 555.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679); *see also Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019) ("Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" (quoting *Iqbal*, 556 U.S. at 678 (quoting, in turn, FED. R. CIV. P. 8(a)(2)))).

While, under Federal Rule of Civil Procedure 8(a)(2), a complaint need not contain detailed factual allegations, a plaintiff must allege more than labels and conclusions, and, while a court must accept all of a plaintiff's allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A threadbare or formulaic recitation of the elements of a cause of action, supported by mere conclusory statements, will not suffice. *See id.* Instead, "to survive a motion to dismiss" under *Twombly* and *Iqbal*, a plaintiff need only "plead facts sufficient to show" that the claims asserted have "substantive plausibility" by stating "simply, concisely, and directly events" that the plaintiff contends entitle him or her to relief. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014) (per curiam) (citing FED. R. CIV. P. 8(a)(2)-(3), (d)(1), (e)); *see also Inclusive Communities Project*, 920 F.2d at 899 ("'Determining

whether a complaint states a plausible claim for relief' is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" (quoting *Iqbal*, 556 U.S. at 679; citing *Robbins v. Oklahoma*, 519 F.3d 1242, 1248 (10th Cir. 2008) ("[T]he degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context.")).

Aside from "matters of which judicial notice may be taken under Federal Rule of Evidence 201," *Inclusive Communities Project*, 920 F.2d at 900 (citations omitted), a court cannot look beyond the pleadings in deciding a Rule 12(b)(6) motion, *see Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Pleadings in the Rule 12(b)(6) context include attachments to the complaint. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Documents "attache[d] to a motion to dismiss are considered to be part of the pleadings, if they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000) (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993)).

While the United States Court of Appeals for the Fifth Circuit "has not articulated a test for determining when a document is central to a plaintiff's claims, the case law suggests that documents are central when they are necessary to establish an element of one of the plaintiff's claims. Thus, when a plaintiff's claim is based on the terms of a contract, the documents constituting the contract are central to the plaintiff's claim." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D.

Tex. 2011). "However, if a document referenced in the plaintiff's complaint is merely evidence of an element of the plaintiff's claim, then the court may not incorporate it into the complaint." *Id.*

And a plaintiff may not amend his allegations through a response to a motion to dismiss. "[A] claim for relief" must be made through a pleading, FED. R. CIV. P. 8(a), and a response to a motion is not among the "pleadings [that] are allowed" under the Federal Rules of Civil Procedure, FED. R. CIV. P. 7(a); *see, e.g., Klaizner v. Countrywide Fin.*, No. 2:14-CV-1543 JCM (PAL), 2015 WL 627927, at *10 (D. Nev. Feb. 12, 2015) ("All claims for relief must be contained in a pleading. A response to a motion is not a pleading and it is improper for the court to consider causes of action not contained in the pleadings." (citations omitted)).

## Analysis

Hughes asserts that the City is liable for the alleged unconstitutional seizures under (1) an official policy and (2) through ratification by a municipal policymaker (then-Chief Brown). *See* Dkt. No. 29, ¶¶ 35-46. And, in moving to dismiss his claims, the City argues (1) that Hughes has failed to allege a constitutional violation (because he "voluntarily went to the police and willingly agreed to speak to them") and (2) "[e]ven if Hughes has alleged a constitutional violation, he nevertheless has failed to allege facts which show that an official policy was to blame." Dkt. No. 30 at 6-8.

To state claim upon which relief may be granted against the City, Hughes "has two burdens: to [plausibly allege] (1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation." *Sanchez v. Young*

*Cnty., Tex.*, 956 F.3d 785, 791 (5th Cir. 2020) (citing *Monell v. Dep't of Soc. Servs.*, 436

U.S. 658, 694 (1978)). The undersigned will address each in turn.

I.    <u>Constitutional Violation</u>

According to the City,

Hughes alleges that DPD officers unlawfully detained him without
probable cause or reasonable suspicion that he committed any crime in
violation of his Fourth Amendment rights. Unlawful detention and
arrest claims implicate the Fourth Amendment's proscription against
unreasonable seizures." In general, there are three types of encounters
between police and individuals. A "consensual encounter," in which the
individual willingly agrees to speak to police, may be initiated by police
without any objective level of suspicion. Without more, a consensual
encounter does not amount to a Fourth Amendment "seizure." *United
States v. Cooper*, 43 F.3d 140, 145 (5th Cir. 1995) (citing *Florida v.
Bostick*, 501 U.S. 429, 435 (1991)). A "limited investigative stop" is
permissible if there is a "reasonable suspicion" that a person has
committed or is about to commit a crime. An arrest must be based on
probable cause. *Id.* at 146. Here, Hughes expressly pleads that upon
hearing that he was a suspect in the shooting, he "immediately went to
a small group of police officers and turned himself in in an effort to clear
up this obvious mistake." [Dkt. No. 29, ¶ 25.] Thus, Hughes voluntarily
went to the police and willingly agreed to speak to them. And based on
the information known to the officers at the time Hughes turned himself
in, specifically, that police were investigating a mass shooting, that
Hughes was present at a police protest carrying an assault rifle minutes
before shooting, it was reasonable for police to question him. Moreover,
Hughes alleges that the police released him after they determined that
he was not involved in the mass shooting. Because Hughes alleges facts
which show that his initial encounter with the police was consensual,
and that his subsequent detention/arrest for questioning about the mass
shooting was reasonable under the circumstances, Hughes has failed to
establish an unlawful seizure or unconstitutional violation. Because
Hughes has failed to establish that a City employee deprived him of his
rights under the Fourth Amendment, Hughes municipal liability claims
against the City fail as a matter of law.

Dkt. No. 30 at 6-7.

Hughes responds:

As clearly pled in Plaintiff's Amended Complaint, DPD officers took

Hughes into custody only after the official announcement that Hughes was a suspect by the DPD's Twitter account, the official announcement by Chief Brown that Hughes was wanted, and internal police department communications identifying Hughes as the suspect who should be detained for the mass shooting. [Dkt. No. 29, ¶ 37.] Hughes had no other choice than to approach officers in an attempt to mitigate the damage already done by Defendant's actions. If Hughes failed to turn himself in immediately after being identified as the key suspect in an ongoing active shooter situation targeting police officers, he risked becoming the victim of further, potentially fatal, violations of his constitutional rights. Submitting to arrest only after an official statement by the DPD releasing his image under the caption "This is our suspect, please help us find him"; a press conference where Chief Brown again released Plaintiff's image and cautioned the public he was both "armed and dangerous"; after his image was circulated among DPD officers-- cannot be reasonably considered a "consensual encounter". The ongoing manhunt and subsequent arrest represents the initiation of deprivation of Constitutional rights of which Plaintiff complains of herein.

Dkt. No. 33 at 5-6.

And the City replies, in sum, that,

[b]ecause Plaintiff alleges facts which show that his encounter with the police was consensual, and that his subsequent detention/arrest for questioning about the mass shooting was reasonable under the circumstances, Plaintiff has failed to establish an unlawful seizure or unconstitutional violation. Plaintiff has failed to establish that a City employee deprived him of his rights under the Fourth Amendment. Plaintiff's municipal liability claims against the City fails as a matter of law.

Dkt. No. 34 at 3.

The City is correct that "[n]ot all police-citizen contact invokes the Fourth Amendment." *United States v. Tinajero*, 34 F. App'x 962, 2002 WL 663726, at *3 (5th Cir. Mar. 27, 2002) (per curiam) (citing *United States v. Galberth*, 846 F.2d 983, 989 (5th Cir. 1988)). And, as the City asserts, there are indeed "three tiers of police-citizen encounters: 'communication between police and citizens involving no coercion or

detention and therefore without the compass of the Fourth Amendment, brief "seizures" that must be supported by reasonable suspicion, and full-scale arrests that must be supported by probable cause.'" *Id.* (quoting *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. 1982) (en banc)).

"Whether in the circumstances of a particular case the Fourth Amendment is invoked depends on the intrusiveness of the encounter as well as the strength of the government interest at stake." *Id.* (citing *United States v. Simmons*, 918 F.2d 476, 480 (5th Cir. 1990)). "A seizure occurs only if 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Id.* (quoting *Berry*, 670 F.2d at 595); *see also Florida v. Bostick*, 501 U.S. 429, 439 (1991) ("[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."). And "[a] police encounter loses its consensual nature, resulting in a Fourth Amendment seizure, '[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *Rothman v. City of New York*, No. 19 Civ. 0225 (CM), 2019 WL 3571051, at *7 (S.D.N.Y. Aug. 5, 2019) (quoting *Terry v. Ohio*, 393 U.S. 1, 19 n.17 (1968)).

Based on the facts that Hughes alleges, even though, initially, he voluntarily "turned himself in" (albeit in response to DPD's tweet and subsequent communication identifying him as a suspect), the Court should not accept the City's position that

Hughes fails to allege that there was ever a Fourth Amendment seizure. The facts alleged reflect that Hughes's consensual encounter escalated and ultimately led not just to his brief seizure but to his arrest. *Cf. Galberth*, 846 F.2d at 993 ("When a suspect validly consents to interrogation or physical investigation, there may in some cases be a seizure for fourth amendment purposes, requiring probable cause ….").

Further, the clear thrust of Hughes's Fourth Amendment claim – against the City, not any individual officer that he encountered who then seized or arrested him – is that Chief Brown's official statements implicating Hughes (and made prior to Hughes's approaching individual police officers) were neither based on reasonable suspicion nor probable cause. *See, e.g.,* Dkt. No. 29, ¶¶ 22, 23, & 24 ("At the time of the official statement via Twitter and the press conference announcement by Chief Brown, the only evidence known to Chief Brown and the Dallas P.D. linking Mark Hughes to the mass shooting" was that he "was observed attending the protest on July 7, 2016" and "was observed carrying a firearm." This alone, considering that "[a]pproximately 800 people attended the July 7th protest; that "[m]ultiple people at the protest were openly carrying firearms; and that it is neither "a crime to attend a protest" nor "a crime to openly carry a firearm in Texas," "did not create reasonable suspicion to detain Mr. Hughes or probable cause to arrest him."); *id.*, ¶¶ 37 & 39 ("Prior to the unlawful detention of Plaintiff, Chief Brown released official statements via a press conference, official Twitter account, and internal police department communications identifying Mr. Hughes as the individual wanted for the mass shooting despite having insufficient evidence to detain or arrest Mr. Hughes. … Chief

Brown's conduct and the official statements of the Dallas P.D. served as an order that Dallas P.D. were to detain or arrest Mr. Hughes without further investigation.").

Based on then-Chief Brown's statements, Hughes has plausibly alleged a Fourth Amendment seizure and related constitutional violation grounded on either a seizure made without reasonable suspicion and/or an arrest made without probable cause that should not be dismissed as factually implausible considering the City's current motion.

II.    Municipal Liability

Even though Hughes has stated a claim under 42 U.S.C. § 1983 based on the Fourth Amendment, he still must articulate facts to plausibly allege that the City of Dallas has violated his rights under the Fourth Amendment. In this regard, Hughes cites *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986),[1] asserting that then-Chief Brown's conduct "serves to make the City of Dallas liable for the subsequent unlawful detention and false arrest of Mr. Hughes." Dkt. No. 29, ¶ 40. In moving to dismiss, the City does not address *Pembaur*. *See generally* Dkt. Nos. 30 & 34.

---

[1] *See id.* at 479-80 ("The 'official policy' requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' – that is, acts which the municipality has officially sanctioned or ordered. With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body – whether or not that body had taken similar action in the past or intended to do so in the future – because even a single decision by such a body unquestionably constitutes an act of official government policy." (footnote and citations omitted)).

The City instead argues that then-Chief Brown's conduct cannot constitute an official policy of the City subjecting the City to liability under *Monell. See, e.g.,* Dkt. No. 34 at 5-6 ("The Complaint does not allege that the City's policymaker promulgated a facially unconstitutional policy statement, ordinance, or regulation. Plaintiff's assertion that Chief Brown's conduct represented the official policy of the municipality is a *respondeat superior* theory. And it is well-settled that a municipality cannot be held liable for the constitutional violations of their employees under a theory of *respondeat superior*. Moreover, isolated unconstitutional actions by municipal employees will almost never trigger municipal liability. [Instead], to hold the City liable under § 1983 a plaintiff must establish that an 'official policy' of the municipality – and not the policy of an individual city official – was the 'moving force' and actual cause of the loss of constitutional rights and any resultant harm." (citations omitted)).

True, "[w]hile municipalities can be sued directly under § 1983, *Monell* establishes that they 'cannot be found liable on a theory of vicarious liability or respondeat superior.'" *Webb v. Twn. of Saint Joseph*, 925 F.3d 209, 214 (5th Cir. 2019) (quoting *Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017), *as revised* (Mar. 31, 2017) (citing, in turn, *Monell*, 436 U.S. at 690-91)); *see also Salazar-Limon v. City of Houston*, 826 F.3d 272, 277 (5th Cir. 2016) ("A municipality and/or its policymakers may be held liable under § 1983 'when execution of a government's policy or custom ... by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury.'" (quoting *Monell*, 436 U.S. at 694; citation

omitted)).

"In other words, 'the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability.'" *Webb*, 925 F.3d at 214 (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); citing *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 412 (5th Cir. 2015)). To assert liability under *Monell*, a plaintiff must therefore allege "(1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009) (citing *Piotrowski*, 237 F.3d at 578).

"Official policy can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski*, 237 F.3d at 579 (quoting, in turn, *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc))); *accord Alvarez v. City of Brownsville*, 904 F.3d 382, 389-90 (5th Cir. 2018) (en banc).

Fifth Circuit caselaw further provides that "even a single decision may constitute municipal policy in 'rare circumstances' when the official or entity possessing 'final policymaking authority' for an action 'performs the specific act that forms the basis of the § 1983 claim.'" *Webb*, 925 F.3d at 214-15 (quoting *Davidson*, 848 F.3d at 395 (citing, in turn, *Pembaur*, 475 U.S. at 480, 482, 484-85); citing

*Anderson v. City of McComb*, 539 F. App'x 385, 388 n.2 (5th Cir. 2013) ("When the policymakers are the violators, no further proof of municipal policy or custom is required.")); *see also Howell v. Twn. of Ball*, 827 F.3d 515, 527 (5th Cir. 2016) ("A municipal liability claim under *Monell* usually involves allegations of an unconstitutional policy of general applicability, formally adopted by an official policy maker or informally established through long-standing practice or custom. A single unconstitutional action, however, may be sufficient in rare circumstances to impose municipal liability under *Monell*, if undertaken by the municipal official or entity possessing 'final policymaking authority' for the action in question." (citing *Brown v. Bryan Cnty., Okla.*, 219 F.3d 450, 461 (5th Cir. 2000); *Pembaur*, 475 U.S. at 480)).

Like the Webbs, Hughes does "not allege any written municipal policy or widespread practice. Instead, [his] argument centers on whether an official with "final policymaking authority" took the actions underpinning [his] § 1983 claim." *Webb*, 925 F.3d at 215.

> "[A] final decisionmaker's adoption of a course of action 'tailored to a particular situation and not intended to control decisions in later situations' may, in some circumstances, give rise to municipal liability under § 1983." This requires the "*deliberate* choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy *with respect to the subject matter in question*." Therefore, the "critical question" is generally "to decide who is the final policymaker, which is an issue of state law."

*Id.* (citations omitted).

The Fifth Circuit has "previously found that Texas police chiefs are final policymakers for their municipalities, and it has often not been a disputed issue in the cases." *Garza v. City of Donna*, 922 F.3d 626, 637 (5th Cir. 2019) (citing *Zarnow*

*v. City of Wichita Falls, Tex.*, 614 F.3d 161, 168 (5th Cir. 2010); *Peterson*, 588 F.3d at 847-48; *Lewis v. Pugh*, 289 F. App'x 767, 776 (5th Cir. 2008)).

And, as explained above, Hughes alleges that the then-Dallas police chief "perform[ed] the specific act that forms the basis of the § 1983 claim" – directing that Hughes be detained or arrested without, as Hughes claims, reasonable suspicion or probable cause. *Davidson*, 848 F.3d at 395 (citing *Pembaur*, 475 U.S. at 480; *Howell*, 827 F.3d at 528; *Anderson*, 539 F. App'x at 388 n.2). This alleged direct action by then-Chief Brown differs significantly from the after-the-fact involvement of the Stafford police chief in *Davidson*.

> Davidson's first argument relies on Chief Krahn's deposition testimony that an officer performs a legal arrest under § 38.02 if an officer has probable cause to believe that the person has committed some other crime at the time they fail to identify. … But even if we assume arguendo that Chief Krahn was a policymaker for the City, his testimony alone is insufficient to demonstrate an official policy for the City because testimony is not a specific act by a policymaker that results in a constitutional violation susceptible to a § 1983 claim. Unlike the situations in *Pembaur*, *Howell*, and *Anderson*, Davidson has presented no evidence that Chief Krahn performed the arrest that forms the basis of Davidson's § 1983 claim. Without this evidence, Davidson fails to demonstrate that Chief Krahn's testimony constitutes the type of "rare circumstance" in which this court may find that the City had a policy of unconstitutionally interpreting § 38.02.

*Davidson*, 848 F.3d at 395

The alleged acts here were, moreover, deliberately directed at Hughes – a command that he be detained or arrested. *Cf. Garza*, 922 F.3d at 638 ("Nothing in the record indicates that De Leon was aware of Garza's presence at the jail, much less that he instructed the jailers to disregard Garza in favor of installing the signs. It thus cannot be said that De Leon's directive was deliberate in the sense meant by

*Pembaur* or that it was tailored to the particular situation of Garza's confinement. Consequently, it is apparent that the record cannot support municipal liability on this basis.").

In sum, Hughes has alleged enough facts to plausibly allege a theory of municipal liability. *Cf. Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 317-18 (5th Cir. 2019) ("Although the district court acknowledged that Cherry Knoll had alleged policymaker involvement, it determined that Cherry Knoll 'implausibly attempt[ed] to elevate the decision it alleges was made by staff to policy made by the City Council.' We respectfully disagree. Cherry Knoll's well-pleaded factual allegations make it plausible that the City Council made the deliberate decision in 2014 to file the Subdivision Plats over Cherry Knoll's objection and to use the filed plats as leverage in its land-acquisition effort. These allegations satisfy the standard for official municipal policy under *Pembaur*, and the district court erred in finding otherwise.").

## Recommendation

The Court should deny Defendant City of Dallas's motion to dismiss [Dkt. No. 30] Plaintiff Mark Hughes's amended complaint [Dkt. No. 29].

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and

specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

     DATED: July 9, 2020

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE